M. A. SAMUELSON, Plaintiff and Respondent,

v.

BROTHERHOOD OF RAILROAD TRAINMEN, ROCKY MOUNTAIN LODGE NO. 852 OF THE BROTHERHOOD OF RAILROAD TRAINMEN, R. L. ABBOTT, D. G. ARMSTRONG, L. L. HOLLIDAY, O. E. BESS, ED. CAMPBELL, G. M. LUDTKE, R. C. SELVIDGE and M. SHEA, Defendants and Appellants.

Burlington Transportation Company, a Corporation, B. F. Longacre, R. H. Phelps and C. B. Metz, Defendants.

M. A. SAMUELSON, Plaintiff and Appellant,

v.

BROTHERHOOD OF RAILROAD TRAINMEN, ROCKY MOUNTAIN LODGE NO. 852 OF THE BROTHERHOOD OF RAILROAD TRAINMEN, R. L. ABBOTT, D. G. ARMSTRONG, L. L. HOLLIDAY, O. E. BESS, ED. CAMPBELL, G. M. LUDTKE, R. C. SELVIDGE and M. SHEA, Defendants and Respondents.

Burlington Transportation Company, a Corporation, B. F. Longacre, R. H. Phelps and C. B. Metz, Defendants.

(Nos. 2282, 2283; Sept. 5, 1944; 151 P, 2d 347)

318

These causes were submitted upon the brief of Ellery, McClintock and Gray, of Cheyenne, Wyoming for plaintiff and respondent in case No. 2282, and for plaintiff and appellant in case No. 2283, and upon the brief of John U. Loomis and Edward T. Lazear, of

320

Cheyenne, Wyoming, for defendants and appellants in case No. 2282, and for defendants and respondents in Case No. 2283.

322

## OPINION

Riner, Justice.

These two cases are direct appeals from a judgment of the District Court of Laramie County and are based upon the same record. This judgment was in favor of M. A. Samuelson, plaintiff below, in certain particulars hereinafter to be stated, and against the Brotherhood of Railroad Trainmen, Rocky Mountain Lodge No. 852 of the Brotherhood of Railroad Trainmen, the Burlington Transportation Company, a Corporation, R. L. Abbott, D. G. Armstrong, L. L. Holliday, O. E. Bess, B. F. Longacre, Ed. Campbell, G. M. Ludtke, R. C. Selvidge, R. H. Phelps, and M. Shea, the defendants below. One C. B. Metz was also named in the amended petition as a defendant but no service of process was made upon him, and hence he is not a party to these proceedings. In certain other respects presently to be set forth the judgment was adverse to the plaintiff and in favor of the defendants above mentioned. Each of the parties are here complaining of those portions of the judgment which the Court entered against them and thereby result the two cases

on appeal. However, under the circumstances, these appellate proceedings being grounded upon the same record one opinion will suffice to dispose of both. Samuelson will be referred to subsequently herein either by surname or as the "plaintiff," and for brevity the Brotherhood of Railroad Trainmen will usually be mentioned as the "Brotherhood," the subordinate Lodge aforesaid as "Lodge No. 852," the Burlington Transportation Company as the "Company" and the individual defendants by their surnames as may be necessary.

The plaintiff, at all the times herein involved, was and is a bus driver or operator in the employ of the Company, and the litigation was instituted by him to determine whether his seniority rights as such driver had been improperly ranked in view of the circumstances in which the several parties were placed and the rules by which they were governed.

The Brotherhood is an unincorporated association of railroad trainmen, switchmen, switchtenders, bus operators and others having a Grand Lodge and Subordinate Lodges holding their charters thereunder. The organization has as its purpose collective bargaining through its proper representatives and engaging in concerted activities for such bargaining and other mutual aid and protection. The Lodge No. 852, located at Denver, Colorado, and Cheyenne, Wyoming, is a duly organized and existing subordinate lodge of said Brotherhood. The Company is an Illinois corporation authorized to transact business in Wyoming and it owns and operates a bus line between Chicago, Illinois, and the Pacific coast, many of whose bus operators are members of the Brotherhood. The individual defendants listed above are all operators employed by the Company who have exercised seniority rights in

their work and who are interested in the controversy involved in this litigation and who may be affected by its outcome.

In the District Court the contentions of the parties were considered upon an agreed statement of facts supplemented by oral and written evidence submitted upon the trial. There is very little, if any, dispute about the controlling facts in the matter and, for the purpose of disposing of the proceedings now before us, they are substantially recited as follows:

From at least June, 1937, and sometime prior thereto, until about July 1, 1939, Samuelson was a member of the Brotherhood. He states that he was a charter member of Lodge No. 600 in Omaha, though the date when he became such member does not seem to be in the record. After July 1, 1939, his membership in the Brotherhood ceased on account of his non-payment of dues and assessments. He was first employed by the Company as a bus driver at Omaha, Nebraska, June 27, 1935. That date fixed the so-called seniority date as between him and other drivers for the Company in that locality for the bus trips or "runs" to which he was entitled.

About June 1, 1937, a bus driver previously employed by the Company at Cheyenne, Wyoming, was discharged and the Company Superintendent in control there applied to one F. D. Hite, Manager of the Company, with jurisdiction over the territory including Omaha and Cheyenne, to secure an operator to fill the vacancy. Hite tendered to plaintiff the opportunity to make this transfer to Cheyenne and this offer the plaintiff accepted. In connection with this tender Hite told plaintiff that his seniority date at Cheyenne would be the same as he had held and used at Omaha, viz., June 27, 1935. Plaintiff was not compelled by Com-

pany order to make this transfer but did so voluntarily, using his seniority date and rights thereunder to secure preference over other drivers at Omaha who might have wished to make such tansfer but who were junior to him in seniority rank.

Samuelson arrived in Cheyenne the night of June 4, 1937, to undertake bus driver work of the Company running out of that city. The first run he took after he arrived was an extra trip to Ft. Collins, Colorado, on June 5, 1937. The following day, June 6 he operated an extra trip to Loveland, Colorado.

Under date of June 8, 1937, W. A. Culver, as Chairman of the General Grievance Committee of the Brotherhood wrote to J. W. Brady, Superintendent of the Company at Cheyenne, as follows:

"Attached you will find the seniority roster that will be effective for the June 10th, bid on runs in the Cheyenne division.

The seniority question is not definitely settled as yet and until such time that it is definitely cleared up this will be the official roster. At the time the question is settled the men will have an opportunity to place themselves on the proper level.

Any mistakes made in the date that your men actually started work for the Company will be rectified as soon as possible."

The roster sheet thus attached was entitled "Cheyenne Seniority Roster." It gave the names of the drivers in the employ of the Company at Cheyenne, their order of seniority numbered "1" to "20," inclusive, and opposite each name was set the Company seniority date. Illustrating this arrangement is the following excerpt:

| "Order | Name | Company Seniority |
|--------|------|-------------------|
| 8 | Howard, J. C. | 6-17-35 |
| 9 | Holliday, L. L. | 6-28-35" |

In this connection it may be noted that this roster was in typewriting and the name of Samuelson did not thus appear on it. However, between the names of Howard and Holliday, arranged as above, there appears on this roster sheet the name of plaintiff written thereon in lead pencil, and between the two typewritten seniority dates, opposite the names of Howard and Holliday, is also written in pencil the date "6-27-35." Plaintiff's testimony is to the effect that he saw this roster list on Superintendent Brady's desk and saw him write into the roster the pencil notation described above before the "runs" were "bid in" or selected by the several bus drivers about the 10th or 11th of June, 1937. Why Brady made the notation, or at whose direction, does not appear. Meanwhile, on the 8th of June, Samuelson was, as he says, assigned to the Cheyenne-North Platte run. The "runs" aforesaid were selected on the 10th or 11th of June, 1937, by the bus drivers by means of passing a sheet, containing a list of the runs or trips, among them in their seniority order, i. e., the driver holding seniority No. 1 had first choice, the man holding the second seniority next received the sheet, and so on, each man marking his choice of runs in the order in which he received the bid sheet. Samuelson testified in the trial that he bid for the Cheyenne-North Platte run in ninth position and this run he held until sometime in the month of August, 1937.

Effective as of June 15, 1937, an agreement conconcerning rates, rules and regulations for motor coach operators was signed by representatives of the Company and the Brotherhood. Prior to that date there had been no agreement between the Brotherhood and the company relative to the operations of drivers and busses, though as appears from Culver's letter supra, and the record before us, seniority status as suggested

by the Brotherhood and adopted or ordered by the Company prevailed both at Omaha and Cheyenne.

This agrement contained among its many articles the one designated "3" and entitled "Seniority." In that article the following provisions were found, material to the solution of the controversy presented by the record before us:

"Section 1. The right to preference of work and assignments will be governed by seniority.

"Section 2. The seniority rank of Operators entering the service will be determined by the hour and date first service is performed for which pay is received under these rules.

"In establishing first seniority roster it is understood that only the service performed on the division upon which the individual Operators are employed will be considered."

The first sentence of Section 3 reads:

"The Lines of the Company shall be divided into seven (7) separate seniority divisions upon which Operators shall hold seniority, as follows:"

There is then set forth a description of these divisions extending from Chicago, Illinois, westward to San Francisco, California. Division No. 2 is detailed as, "All lines west of Osceola and Des Moines, Iowa, to North Platte and McCook, Nebraska, and south to Kansas City, Missouri.", and Division No. 4 as, "All lines Cheyenne, Wyoming, to North Platte, Nebraska, and Rock Springs, Wyoming, and Billings, Montana." It will be observed that according to this arrangement Omaha was located in Division No. 2, and Cheyenne, in Division No. 4. Section 8 of Article 3, is of especial importance here and it provided:

"When an Operator leaves one seniority division voluntarily to work on another division he shall rank from date of transfer on that division and forfeit all seniority privileges on his former seniority division.

Provided, however, that due to shortage of Operators, or for the purpose of equalizing employment or otherwise fill the requirements of the service Operators may be temporarily transferred from one division to another without loss of seniority on home division."

Section 1 of Article 27, of said agreement reads:

"No ruling affecting the final interpretation of this agreement will be made without concurrence of the proper representative of the Brotherhood."

After plaintiff arrived in Cheyenne and about June 26, 1937, the General Grievance Committee of the Brotherhood adopted a resolution that where Operators had, "shifted from one division to another, they might exercise the option of returning to the division upon which they were originally employed, assuming seniority as of the date of first service there, provided such option were exercised within 30 days from the date of the resolution, and that otherwise divisional seniority would prevail." Samuelson did not avail himself of this option but remained and continued to work in Division No. 4.

Pursuant to the agreement aforesaid a new seniority roster was issued on or about August 16, 1937, and on it, in twenty-first rank, appears the name of M. A. Samuelson, with the seniority date "5-5-37" assigned to him. It is conceded that this date was clerically erroneous and should have read "6-5-37," to correspond evidently with the date when plaintiff first performed service on Division No. 4.

August 30, 1937, and after the thirty days period provided in the resolution of June 26, supra, had elapsed, Culver, as Chairman of the General Grievance Committee of the Brotherhood, advised the membership of the Brotherhood to this effect:

"DECISION. The divisional seniority Rosters, as corrected August 16th, 1937, will stand, unless it can be shown that the dates are not correct. Operators

*will not be permitted* to return to or exercise seniority on any district other than the one upon which employed at the time the Agreement became effective."

Appeals from this decision were filed by the plaintiff and other operators, with the Board of Appeals of the Brotherhood and on December 1, 1937, that body, after considering these appeals sustained the decision thus announced.

Thereafter and on February 16, 1938, the General Grievance Committee of the Brotherhood for the Company met at Denver, Colorado, and the minutes of that meeting disclosed that R. L. Abbott, a member of said committee and local chairman representing Division No. 4, brought before the Committee the matter of the seniority rosters theretofore issued, and on motion this subject was made a special order of business for February 18, 1938. On that date the minutes of the committee meeting recite that:

"After giving careful consideration to all the facts submitted to the Committee and the decision of the Board of Appeals in case No. 907—File No. 4470-119 the Committee expressed its findings in the following resolution:

RESOLUTION OF FEBRUARY 18, 1938 IN RE SENIORITY OF MOTOR COACH OPERATORS EMPLOYED BY BURLINGTON TRANSPORTA-TION COMPANY.

WHEREAS, Prior to the organization of the motor coach opeartors of the Burlington Transportation Company b ythe Brotherhood of Railroad Trainmen seniority was recognized by the management in the following territories:

The territory covering all lines Chicago, Illinois and west to Osceola and Des Moines, Iowa. This territory was commonly designated as the Eastern Region.

The territory covering all lines west of Osceola and Des Moines, Iowa, to Rock Springs, Wyo-

ming. This territory was divided into three separate seniority districts, commonly known as the Omaha District, the Denver District, and the Cheyenne District.

Seniority was not recognized by the management in the territory known as the Western Region. This territory covered all lines west of Rock Springs, Wyoming, to Los Angeles and San Francisco, and

WHEREAS, In the Districts where seniority was recognized seniority ratings were generally known and all operators were in a position to ascertain what seniority ratings they held, and

WHEREAS, An agreement was executed between the Brotherhood and the Burlington Transportation Company which became effective June 15, 1937, which provided that the lines of the Company would be divided into seven (7) separate seniority divisions upon which Operators would hold seniority. The Agreement further provided that in establishing first seniority rosters only the service performed on the division upon which the individual Operators were employed would be considered, and

WHEREAS, In establishing the seniority rosters the Committee did not recognize the seniority ratings already held by Operators in the districts upon which seniority had been recognized by the management and exercised by the Operators, and

WHEREAS, The General Chairman issued the following decision during the month of August, 1937:

## DECISION

'The Division Seniority Rosters, as corrected August 16, 1937, will stand, unless it can be shown that the dates are not correct. Operators will not be permitted to return to or exercise seniority on any district other than the one upon which employed at the time the Agreement became effective.' and,

WHEREAS, Appeals from the decision of the General Chairman were taken to the Board of Appeals by Operators whose seniority was changed from already established dates to dates of actual service

performed on the district and contrary to previous understandings with the Company, and

WHEREAS, The Board of Appeals upheld the decision of the General Chairman, and

WHEREAS, The General Grievance Committee, after due deliberation, has determined that the dates shown on the seniority rosters published August 16, 1937, do not preserve the seniority that had previously been recognized by the management and that a correction of seniority dates as shown on the August 16, 1937 seniority rosters is necessary, and

WHEREAS, The General Grievance Committee has determined that in the territories where seniority prevailed prior to the effective date of the Agreement the seniority in effect immediately prior to the effective date of the agreement reflects the proper seniority of the Operators in such districts, and

WHEREAS, The General Grievance Committee has determined that correction of seniority dates in conformity with the foregoing principles will be in accordance with the Decisions of the Board of Appeals, and

WHEREAS, The General Grievance Committee has determined that all pending seniority claims should be adjusted in conformity with the foregoing, NOW, THEREFORE BE IT

RESOLVED, That the General Chairman be instructed to negotiate a correction of seniority dates with the management of the BTCo. and close out all pending claims in conformity with the foregoing."

This resolution was adopted by the Committee. That body also, on motion made and carried, directed that all grievances not disposed of should be referred to the general chairman "for proper handling," and also that said chairman should be "delegated to act for the full general committee while the committee is not in session." The General Grievance Committee adjourned finally at 1:25 A. M., February 19, 1938. Mimeographed copies of the minutes of this meeting of the General Grievance Committee, including the

resolution aforesaid, were mailed to the plaintiff and all other members of the Brotherhood as well as to the secretary of the Lodge No. 852 aforesaid, of which plaintiff was at that time a member.

After extended exchange of correspondence between Culver, as chairman of the General Grievance Committee, and H. W. Stewart, general manager of the Company, the latter, under date of March 15, sent to Culver, "four copies each of Seniority Rosters for each division as of March 1, 1938." In the letter transmitting these copies the general manager states:

"The Roster for division No. 4 was revised to include seniority of all drivers performing service in either divisions 2, 3 or 4 prior to the date of agreement. Due to the voluntary decisions of drivers Samuelson and White, the dates shown on the Roster are as of the first day performing service on Division No. 4."

Pursuant to the action of both the General Grievance Committee of the Brotherhood and the Company a new seniority roster for Division No. 4 was posted on the bulletin boards of that division about March 1, effective either April 1, 1938, or May 1, of that year, the record not being altogether clear on the point. This roster is the one mentioned in the letter of General Manager Stewart, supra. In that roster Samuelson is again listed as in rank No. 21, with seniority date "5-5-37."

The Constitution and General Rules of the Brotherhood contain the following provisions which are material in the case at bar:

Under rule 3 the General Grievance Committee is required to carefully investigate all matters "lawfully placed in its hands," and when satisfied of the justness of any claim it "shall proceed with an effort to adjust the same with the general officers" of the

Company. Rule 4 directs the chairman of the General Grievance Committee to preside at its meetings, act as its executive head, and see that "the laws and rules of the Brotherhood are observed." Rule 7 declares that the General Grievance Committee may authorize their chairman to handle all grievances received from local lodges with the Company for settlement. The Constitution, Section 15a, directs that a Board of Appeals consisting of seven members, shall be elected, to which shall be referred all appeals arising under general rule No. 10. Concerning the effect to be given an adjudication by the Board of Appeals, Section 15b of the Constitution provides:

"Such decision shall be the final adjudication of any and all rights and questions included in the appeal."

It would appear reasonably clear from this language that this board is the court of final resort in the Brotherhood. Allen v. Southern Pacific Co., 166 Or. 290, 110 Pac. 2d 933. Rule No. 10, mentioned above, so far as here pertinent reads:

"Whatever action may be taken by the General Grievance Committee or Board of Adjustment of any system within the meaning of the above General Rules shall be law to the Lodges on that road until *and unless reversed by the* Board of Appeals, and if any member refuses to vote or abide by the action of such General Grievance Committee or Board of Adjustment he shall be expelled from the Brotherhood for violatoin of obligation. Any member believing an injustice has been done him by the action of a sub-general grievance committee or board of adjustment may, if he desires, appeal to the full General Committee or Board of Adjustment within ninety (90) days from date of decision rendered, or he may appeal to the Board of *Appeals* within sixty (60) days from receipt of notice of such decision. In the event he decides to appeal his case to the full General Committee or Board of Adjustment and then is not satisfied with such decision

he may appeal to the Board of *Appeals* providing such appeal is filed within sixty (60) days after notice of decision is rendered, or in case the General Committee has not had a meeting at which action has been taken on an appeal, and such appeal is still pending a hearing by the full committee, if the appellant, or Lodge from which the grievance emanated, so requests, it shall be the duty of the secretary of the General Grievance Committee or Board of Adjustment, to refer the same to the Board of *Appeals* at least thirty (30) days before the convening of such board."

The plaintiff appears not to have taken any appeal from either the action of the General Grievance Committee as expressed in its minutes of February 18, 1938, supra, or the action of its chairman in negotiating with the Company and promulgating the seniority roster of date March 1, 1938, within the time fixed by the rule last above quoted.

However, about January 15, 1939, several of the members of the Brotherhood in Division No. 4, but not a majority thereof, and including the plaintiff, wrote to W. A. Culver, chairman of the General Grievance Committee of the Brotherhood, asking that something be done looking towards the assignment of plaintiff to his Omaha seniority. A copy of this letter was sent to R. L. Abbott, chairman of the local Grievance Committee of the Brotherhood in Division No. 4. Culver, under date of January 18, 1939, wrote to plaintiff in reply to the letter last above described as follows:

"This will acknowledge receipt of undated letter written to the General Chairman signed by Operators Lowry, White, Howard, R. A. Phelps, Hulse, Greene and yourself relative to adjustment of seniority status of yourself and of Operator L. B. White.

"The seniority of yourself and Operator White was considered at the last General Committee meeting (February, 1938). The seniority you are now holding

is in conformity with the decision rendered by the General Committee.

"In the event you feel you have a grievance you will present same in writing with full facts and any evidence that might be beneficial to you in support of your grievance to your Local Chairman, R. L. Abbott, who will then be in a position to present your case to the General Grievance Committee."

February 25th, following, plaintiff transmitted to Abbott an extended letter reviewing again his claims concerning his seniority status. This communication, under date of March 8, 1939, was forwarded to Culver by Abbott. The latter evidently regarded this letter from Samuelson to Abbott as an attempted appeal from the decision of the General Grievance Committee on February 18, already described, for the chairman wrote to Samuelson under date of May 23, 1939, closing the matter thus:

"Under date of March 8th, 1939, Local Chairman R. L. Abbott, Division No. 4, furnished the General Committee with letters which constituted an appeal on your behalf from a decision rendered by the General Grievance Committee February 18th, 1938. Such seniority decision was posted in a roster effective May 1st, 1938.

"The Constitution and General Rules of the Brotherhood of Railroad Trainmen provides that appeal must be made within 60 days from the date General Grievance Committees decision was rendered.

"Your appeal is outlawed under Brotherhood law and is therefore denied."

It would appear that plaintiff, by a letter dated November 26, 1940, addressed to the president of the Brotherhood endeavored to obtain action by the company regarding plaintiff's seniority status, but that official replied that under Brotherhood law the matter could not be handled as Samuelson was at that time no longer a member of the organization.

August 1, 1941, plaintiff commenced his action in the District Court aforesaid to obtain a declaratory judgment that plaintiff was entitled to have his seniority "determined to be as of June 27, 1935" the date when plaintiff first began his work for the company at Omaha, Nebraska, and that the Brotherhood, its officers and agents, the local lodge and its officers and agents, be enjoined from interfering with plaintiff's seniority when thus determined, so long as plaintiff continued in the company's employ; and that plaintiff recover of the Brotherhood damages in the amount of $1,500.00 with legal interest thereon. Plaintiff's amended petition contained two alleged causes of action, the first one setting out his claims relative to his seniority rank and date, and the second cause of action presented his claim against the Brotherhood for damages on account of denying his claim for seniority as of June 27, 1935, his seniority date in Omaha before his transfer to Cheyenne.

The Brotherhood, the Lodge No. 852, and the individual defendants answered in effect that plaintiff's case was properly disposed of under Brotherhood law as contained in its Constitution, General Rules and the Agreement of June 15, 1937, aforesaid; that plaintiff, having voluntarily transferred from Omaha to Cheyenne, his seniority status was correctly fixed by the authorities of the Brotherhood as of the date when he first performed service in Division No. 4; that plaintiff is not entitled to damages in view of the correct disposition of plaintiff's case by the Brotherhood and that his petition should be dismissed.

The answer of the company was in substance that: "* * * the respective seniority rights of the several bus operators, in their employment by this defendant, are matters in which such bus operators have the exclusive legal interest, as among themselves; that this defendant has no legal interest therein; that the plain-

tiff and the other defendants are the real parties in interest with respect to the matters alleged in the plaintiff's amended petition; that this defendant desires to, and does, take a position of neutrality in any and all controversies and issues relating to the plaintiff's seniority status or rights in said employment;".

The trial Court, by its judgment, briefly summarized, declared that Plaintiff was entitled to have his seniority right determined to be as of June 27, 1935, and that the Company 'was directed to issue a new seniority roster on which plaintiff's seniority should be listed as of that date, for his immediate use thereof. The Second cause of action of plaintiff's amended petition was dismissed by the judgment aforesaid with prejudice.

It will materially aid in disposing of this litigation if we here review in some measure the extent to which judicial authorty may be properly invoked in controversies between unincorporated associations and trade unions, such as the Brotherhood herein, and their members. It is not every disagreement of this character which the Courts will undertake to resolve as will be clearly seen from the following:

First, there is the principle well established concerning the internal management of voluntary associations, both generally speaking and particularly applicable to trade unions, that if rights exist in consequence of contracts between an employer and such organizations, and these rights are to operate and be enforced, pursuant to the organization's constitution, by-laws and rules, and by the established authorities and tribunals thereof, the decisions of the latter will not ordinarily be interfered with by the Courts unless their action has been such as may be described as fraudulent, mala fide, arbitrary, violative of public policy, the general law or in excess of jurisdiction.

So we find the Supreme Judicial Court of Massachusetts considering seniority right questions in Donovan, et al., v. Travers, et al., 285 Mass. 167, 188 N.E. 705, has declared that:

"It is settled law that members of an unincorporated, voluntary association, like the brotherhood, are bound by the determination of the association's tribunals if the decision is reached after observance of the formalities it prescribes, after fair opportunity for presenting their case, where there has been no excess of jurisdiction, no bad faith or capricious, unreasonable or arbitrary action. Richards v. Morison, 229 Mass. 458, 461, 118 N.E. 868. Whatever may have been the errors of the Brotherhood with reference to the appeal to the board of directors later sought by the plaintiffs, nothing appears from the report to show that the decision here reached by the committee was invalidated for any of the causes recited. * * * Althought a right of seniority such as is here asserted is undoubtedly a valuable property, it arises only from agreement. We see no illegality in a rule that one who acquires seniority in a particular place and who is entitled to carry it with him to another, must reckon seniority in that other place from the time at which the right to its exercise in that other place accrued to him. One is not deprived of property thereby."

Seniority rights were also involved in Shaup v. Grand National Brotherhood of Locomotive Engineers, 223 Ala. 202, 135 So. 327, and the Court, after outlining the facts submitted by a bill of complaint to which a demurrer had been sustained, followed by final decree, remarked that:

"The facts alleged are incompatible with any charge of fraud or unfair or arbitrary ruling, and no such charge is made, but they show only a construction of the rules of the order upon a matter as to which an honest difference of opinion may well appear to exist. But the courts are indisposed to interfere with the internal management of such organizations, and do

not grant relief under such circumstances. Grand International B. of L. Engineers, v. Green, 210 Ala. 496, 98 So. 569, 572."

Approved quotations were then made from Simpson v. Grand International Brotherhood of Locomotive Engineers, 83 W. Va. 355, 98 S.E. 580, 587, and State et rel. Smith v. Kanawha County Court, 78 W. Va. 168, 88 S.E. 662, 664, 20 A.L.R. 1030. From the opinion in the Smith case the following language was taken:

"The right of a voluntary organization to interpret and administer its own rules and regulations is as sacred as is the right to make them, and there is no presumption against just and correct action or conduct on the part of its supervising or appellate authorities and tribunals. On the contrary, the presumption is in favor of it. In connecting himself with the organization, a member subjects himself as fully and completely to the power of the administration, within legal limits, as to the power of legislation or prescription. To say courts can make rules and regulations for such associations would be absurd and ridiculous. To say they may interpret and apply them, in view of the powers reserved to, and exercised by, the governing bodies of the association, would be as plainly subversive of contractual right."

In Allen v. Southern Pacific Co., 166 Or. 290, 110 Pac. 2d 933, hereinabove cited, which was another dispute over seniority rights, we find as one of the defendants in that case the identical Brotherhood which was drawn into the case at bar, and the Court had occasion to interpret certain provisions of both its Constitution and General Rules, which require consideration at our hands now. At the risk of some repetition we regard it as not amiss to note that the Court said:

"It is clear from the various provisions of the constitution and general rules above referred to that the Brotherhood, through its various committees and tri-

bunals, provides an exclusive method of settling all grievances and disputes between its members, including the settlement of their respective seniority rights, and that, in respect to all said matters, the board of appeals is the court of last resort whose decisions are final and conclusive upon all its members. See Cannon v. Brotherhood of Railroad Trainmen, 262 Ky. 113, 89 S.W. 2d 620, and authorities there cited. The constitution expressly provides: 'Such decision (of the board of appeals) shall be the final adjudication of any and all rights and questions included in the appeal'."

And also:

"By this suit, the plaintiffs are in effect appealing to this court from the decision of the board of appeals in respect to a matter over which the Brotherhood has exclusive control. This case, therefore, comes within the well established rule that, when the constitution and by-laws of an unincorporated, voluntary association, such as the Brotherhood, are reasonable and valid and provide a mode for determining when relief shall be given or denied to its own members by tribunals provided for therein, redress therefor may not be sought in the courts. See Ryan v. New York Cent. R. Co. 267 Mich. 202, 255 N.W. 365, and authorities there cited."

4 Am. Jur. 466, Section 17, declares that, "The decisions of the tribunals of an association with respect to its internal affairs will, in the absence of mistake, fraud, collusion, or arbitrariness, be accepted by the courts as conclusive."

The negative and positive attitude of judicial authority on questions of this character is thus set forth in 7 C.J.S. 79, 81:

"The courts will not interfere with the internal affairs of an unincorporated association so as to settle disputes between the members, or questions of policy, discipline, or internal government, so long as the government of the society is fairly and honestly administered in conformity with its laws and the law of the

land, and no property or civil rights are invaded, and, under such circumstances, the decision of the governing body or established private tribunal of the association is binding and conclusive and not subject to review or collateral attack in the courts. * * * Nevertheless, the courts have and will exercise power to interfere in the internal affairs of an association where law and justice so require, and the proceedings of the association are subject to judicial review where there is fraud, oppression, or bad faith, or property or civil rights are invaded, or the proceedings in question are violative of the laws of the society or the law of the land, or ultra vires, or are otherwise illegal."

See also Louisville & N. R. Co., v. Miller, 219 Ind. 389, 38 N.E. 2d 239, 142 A.L.R. 1050, and pertinent note appended thereto at p. 1055, 1058, and cases cited from many jurisdictions; Order of Railway Conductors of America v. Shaw, 189 Okl. 665, 119 Pac. 2d 549; Harris v. Missouri Pacific R. Co., 1 Fed. Supp. 946, 949; Brotherhood of Railroad Trainmen, v. Price (Tex. Civ. App.) 108 S.W. 2d 239; 126 S.W. 2d 74; Capra v. Lodge No. 273 of Brotherhood of Locomotive Firemen and Enginemen, 102 Colo. 63, 76 Pac. 2d 738.

Another legal principle not to be overlooked here is well stated in the above cited note in 142 A.L.R. 1055, at 1069, in this language:

"In harmony with principles applicable to associations generally, and to labor unions in particular, it has frequently been held that a member of a labor union is not entitled to judicial relief from a decision of an officer or tribunal of the union which settles, adversely to such member's claim, a controversy within the union over seniority rights arising under its constitution, rules, and by-laws, and its contract with the employer, where the member has failed, without adequate excuse, to exhaust his remedies by available appeal within the union."

The extended list of authorities cited abundantly supports the text above quoted. See also 7 C.J.S. 81, Section 34; 47 Yale Law Journal 73, 76.

The nature of seniority rights arising out of an agreement the result of collective bargaining such as we have before us in the case at bar is appropriately described by the A.L.R. note, supra, as follows:

"As a starting point, the courts are apt to observe that seniority is not an inherent, natural, or constitutional right, and does not arise from mere employment, independently of contract, but exists by virtue of the contract between the employer and the union, inuring through the latter to the benefit of the members."

A number of cases are listed from some ten jurisdictions in the marginal note to the foregoing statement which announce this view. Illustrative of this summary of case law on the point in Order of Railroad Conductors of America v. Shaw, 189 Okl. 665, 119 Pac. 2d 549, this language is used which also affords a definition of the right of seniority as applied in transportation service:

"As said above, the rights of seniority arise wholly from the union's contract with the company. Such contract merely guarantees the continued recognition of those rights, and they inure to the benefit of the employees. Seniority in train service means merely the privilege of choosing runs or assignments of service as they are arranged by proper authority, but does not guarantee that an assignment when chosen should forever remain inviolate as a vested property right."

So in Fine v. Pratt, (Tex. Civ. App.) 150 S.W. 2d 308, the Court says:

"Seniority rights as applicable to trainmen have been defined to mean 'that a man shall be entitled to preference in matter of choice of and right to work in his occupation in accordance with length of time he has been employed.' 38 Words and Phrases, Permanent Edition, p. 594. See also definition in George T. Ross Lodge, etc., v. Brotherhood of R. T., 191 Minn. 373, 254 N.W. 590."

Indeed, plaintiff in his brief recognizes that his right to seniority in the case at bar arises under the contract hereinbefore mentioned between the Brotherhood and the Company, and whose material provisions relative to that right have been recited above, for he says:

"The contract is of course the basis of Samuelson's claim to seniority and in order to be entitled to a certain seniority date as against the Company, he must show that he is within the terms thereof."

The position of the plaintiff herein appears to be that the action of the General Grievance Committee heretofore detailed in the quoted portion of the minutes of its meeting of February 18, 1938, where this was said: "WHEREAS, The General Grievance Committee has determined that in the territories where seniority prevailed prior to the effective date of the Agreement the seniority in effect immediately prior to the effective date of the agreemnt reflects the proper seniority of the Operators in such districts," was favorable to him and in effect was a determination by that committee that he was entitled to his seniority rights as they existed in Omaha prior to his transfer to Cheyenne, and that there was no need for him to take an appeal therefrom. We do not so interpret the action of the committee as thus expressed, and this for several reasons:

The chairman of the General Grievance Committee who was present at the meeting, and evidently took part in the discussion of the entire seniority question then under consideration, (including, as we have seen from his letter to Samuelson quoted above, Samuelson's own status in this matter), concluded otherwise as shown by the issuance of the new roster dated March 1, 1938. Again it is plain that the typewritten roster sent by Culver, the general chairman aforesaid,

to Superintendent Brady, under date of June 8, 1937, after Samuelson had transferred to Cheyenne, did not contain the latter's name at all. True, Brady, according to plaintiff's testimony, penciled into this roster list Samuelson's name and his Omaha seniority date, and he was allowed to "bid in" a run at Cheyenne on that basis. But it is not shown that Brady had authority to do what he did. His action had not the sanction of the Brotherhood of which Samuelson was then a member, and by whose constitution, rules and regulations he was bound. It is clear that the roster used then for the selection of runs by the several Cheyenne operators was not presented by Brady, and the inference is a fair one that he himself had no authority to prepare such a list. In fact, that roster list came from Culver, and he also states in his letter transmitting it, as set forth above, that the seniority question was, at that time, not definitely settled.

Further, the position taken by plaintiff as hereinbefore outlined would seem to be inconsistent with his admission that his seniority rights must be governed by the contract effective June 15, 1937. That contract expressly provided in Section 8, Article 3, thereof, supra, that when an operator voluntarily left one seniority division to work on another division, he would "rank from date of transfer on that division and forfeit all seniority privileges on his former seniority division." The General Grievance Committee's action, at its February 18, 1938, meeting, can not fairly be construed as an attempt to set aside that provision. It could hardly do it without the assent of the Company, the other party to the contract, and no such assent appears in the record at bar. On the contrary, we observe that Culver, at the February 18, 1938, meeting, was duly authorized by the General Grievance Committee to negotiate with the Company for

the correction of seniority dates, and after having done so we find that Mr. H. W. Stewart, the General Manager of the Company, writing to Culver under date of March 15, 1938, and stating in part:

"The Roster for division No. 4 was revised to include seniority of all drivers performing service in either divisions 2, 3 or 4 prior to the date of agreement. Due to the voluntary decisions of drivers Samuelson and White, the dates shown on the Roster are as of the first day performing service on Division No. 4."

Thus, both Culver, for the Brotherhood, and Stewart, for the Company, evidently regarded said Section 8, in full force and effect for the preparation of roster lists. The roster dated March 1, 1938, undoubtedly embraced that principle, for Samuelson was listed with a seniority date conforming with the date he commenced to work for the Company in Cheyenne. (As hereinbefore noted a clerical error in the roster fixed May 5, 1937, as this date instead of June 5, 1937, the actual one). It is significant, too, that both Samuelson and the Company unquestionably acted under this new roster for many months thereafter. As a matter of fact, it was not until January of the following year that there is evidence of any attempt on Samuelson's part to change this situation.

Even if we were to assume that Culver erroneously construed the action of General Grievance Committee, as shown by its minutes of the aforesaid meeting of February 18, 1938, and mistakenly issued the roster of March 1, 1938, which assigned Samuelson a seniority date corresponding with his first employment at Cheyenne, still plaintiff is not aided in the ultimate result of this lawsuit. When that roster was posted on either April 1, or May 1, 1938, Samuelson knew that a decision adverse to his asserted rights had been put into effect. Both he and the Company acted under

it for the remainder of the year, 1938, so far as the record before us shows. He took no appeal within the time fixed by the Constitution and General Rules of the Brotherhood from that decision and, not having done so, he became bound by the roster list thus promulgated under the authorities reviewed above.

It is suggested that the chairman of the General Grievance Committee acted arbitrarily, wrongfully and fraudulently, in issuing the March, 1938, roster. There seems to be no claim of this nature advanced in the plaintiff's pleadings and we fail to find any proof in the record that his actions should be so regarded. Indeed, it is apparent that the Brotherhood authorities acted quite fairly and reasonably regarding plaintiff's asserted rights. As recited above, the General Grievance Committee, about June 26, 1937, and after the effective date of the agreement between the Brotherhood and the Company, but before the roster of August 16, 1937, was issued, accorded Samuelson a thirty day period during which he could have returned to Omaha and resumed his old seniority right. As above stated however, he did not see fit to avail himself of that privilege. After that period had elapsed Culver announced the decision hereinbefore detailed, which required the division seniority rosters, as corrected August 16, 1937, to stand unless it was shown that the dates therein were not correct. From this decision plaintiff appealed and failed in the appeal before the Board of Appeals of the Brotherhood, the final authority on the matter. He evidently was unable to convince the Board of Appeals that the date of his seniority, as fixed in the August 16, 1937, roster, was incorrect. That date was reaffirmed in the new roster of March 1, the following year, and after the session of the General Grievance Committee had occurred in the month of February preceding. In this

connection it is noteworthy that the committee last mentioned quoted that decision of Chairman Culver, recognized it affirmance, and endeavored to make the committee's own decision coincide with that of the Board of Appeals as it logically and legally was required to do, the Board being the final authority in the Brotherhood.

It is urged for the plaintiff that Manager Hite, at Omaha, told Samuelson, before he left that city, that his seniority date at that place would follow him to Cheyenne. What authority Hite possessed for making such a statement does not appear. Apparently the Brotherhood was not consulted and Samuelson knew, as a member of that organization, that seniority rights for service were matters that concerned that body principally and not the Company. This is very clearly indicated by the answer of the Company in the instant suit, expressing its complete neutrality between the Brotherhood and the plaintiff relative to the questions involved herein.

63 C.J. 694, Section 66, says:

"The right of a member to preference in the selection of trainmen to man certain trains, acquired under an existing regulation by virtue of their seniority, is not such a vested right as cannot be destroyed or modified by a subsequent regulation duly adopted under the constitution and by-laws of his union, or as will justify equity interfering to preserve it."

The power and authority of the Brotherhood to deal with seniority rights of its members is appropriately illustrated by the decision of the Supreme Court of Michigan, in Hartley v. Brotherhood of Railway & Steamship Clerks, 283 Mich. 201, 277 N.W. 885, where it was held that a member of a voluntary unincorporated trade union organization which had entered into an agreement respecting seniority rights with a rail-

road system by which the member, a married woman, was employed, did not thereby acquire any contractual rights which would entitle her to maintain an action for damages resulting from a subsequent agreement with the system, that in view of economic conditions married women would be relieved from service when a reduction of employees became necessary irrespective of seniority, absent arbitrary action, or fraud directed at the member. The Court used the following emphatic language which is frequently found quoted by other appellate opinions:

"The seniority rights acquired by her did not arise by virtue of her contract of employment with her employer, but existed by reason of the agreement of 1921 between the Railway and the Brotherhood. Ryan v. New York Cent. R. Co., 267 Mich. 202, 255 N.W. 365. This agreement was executed for the benefit of all the members of the Brotherhood ,and not for the individual benefit of plaintiff. When, by reason of changed economic circumstances, it became apparent that the earlier agreement should be modified in the general interest of all members of the Brotherhood it was within the power of the latter to do so, notwithstanding the result thereof to plaintiff. The Brotherhood had the power by agreement with the Railway to create the seniority rights of plaintiff, and it likewise by the same method had the power to modify or destroy these rights in the interest of all the members."

And the author of the article on "Seniority Rights in Labor Relations" in 47 Yale Law Jnl. 73, 87, says that:

"A voluntary transfer generally operates to extinguish the seniority rights of the transferee in his old department."

See also Steele v. Louisville & N. R. Co. ......... Ala. ........, 16 So. 2d 416; Coley v. Atlantic Coast Line R. R., 221 N.C. 66, 19 S.E. 2d 124.

In this connection may well be reviewed the case of Chicago R. I. & P. Ry. Co., v. Sawyer, 176 Okl. 446, 56 Pac. 2d 418. Summarized, the facts there were that the defendant railway company entered into a contract with a railway Brotherhood called the "Clerks' Union" of which plaintiff was a member. This agreement was made in 1922. Plaintiff had been first employed by the defendant May 2, 1919. The contract dealt with seniority in service, wages, hours, etc. The employee's seniority or length of service with the Company generally determined the position he could hold. The Company, the union and its membership alike relied on the seniority rule and acted under it. In 1925, plaintiff held the job of ticket seller in the defendant's depot office in Oklahoma City. He worked under one Richard, defendant's depot ticket agent at that place. Early in that year the defendant's division passenger agent, one Collins who worked in another office and operating division of the Company, desired the transfer of plaintiff to his office and suggested to plaintiff and Richard that such a transfer be made. Being aware that he might lose his seniority in Richard's division if the transfer took place, and so before accepting the other position which was somewhat more desirable than the one he held, plaintiff consulted with both Richard and Collins as to the effect of the transfer upon his seniority. These agents of the defendant advised him that he could make the transfer under the contract without losing his old seniority right and that when the new work ceased, plaintiff could return to his old job with unimpaired status in that respect.

Plaintiff made the transfer March 12, 1925, remained at the new work until July, 1926, when he returned to his former employment where he continued until September 5, 1931, when it was abolished. About 1938, plaintiff severed his connection with the

Clerks' Union. From 1926 to 1931 defendant posted periodically a list of its employees in the Oklahoma City division and gave plaintiff seniority as of May 2, 1919, the date of his first employment there. In 1931, when plaintiff's job was abolished, he undertook to exercise that seniority right by bidding in a job held by an employee supposedly holding a junior seniority to plaintiff. The defendant acquiesced in this act of the plaintiff and ordered the change. However, the employee thus displaced and also the Clerks' Union insisted that plaintiff's seniority dated from July, 1926, when he returned to his old job at Oklahoma City. When the union and the defendant consulted over the matter it was agreed that plaintiff lost his 1919 senioriy when he transferred in 1925 to another operating division or seniority list. Defendant, accordingly, revoked its previous order of change. Plaintiff objected to this ruling, took other employment and finally sued the defendant for some seven months' salary.

The Court below allowed the plaintiff Sawyer to recover. This judgment was by the appellate court reversed and it was held, according to the syllabus prepared by the Court that:

"A master is not responsible for the consequences of bad advice given by a servant whose duties do not include the giving of advice and counsel generally."

Appropos the point the Court said:

"It is true, as urged by plaintiff, that defendant, a corporation, can only act through its agents. American Soda Fountain Co. v. Stolzenbach, 75 N.J. Law 721, 68 A. 1078, 16 L.R.A. (N.S.) 703, 127 Am. St. Rep. 822. But this rule exists only with concomitant rules, and one of these is that an agent ordinarily cannot act for or bind the corporation in matters not within the scope of the agents' authority. The alleged agreement of these agents of defendant to preserve the seniority of plaintiff was beyond the power of the corporation,

and, under the overwhelming evidence of this record, the agreement touched upon a matter wholly without the scope of the authority, apparent or real, of these agents. The agreement which they were undertaking to make with plaintiff related to a matter not entrusted to them, it affected a general contract negotiated and entered into between defendant and its employees, union and non-union, collectively, and neither plaintiff or defendant could alter the terms thereof."

It results from the facts and law, as we view them in these two cases, that the District Court of Laramie County erred in entering a judgment in plaintiff's favor on the question of his seniority rights, a matter determined against him by the authorities and tribunals of the organization to which he belonged and in whose decisions he was bound to acquiesce, there being no fraud, arbitrary or illegal action on their part either pleaded or proven. This indicates the disposition which we are obliged to make of case No. 2282. From the foregoing premise it logically follows that that portion of the Court's judgment from which plaintiff has appealed was correct and this view disposes of case No. 2283.

The judgment under review will therefore be reversed as to that portion which accords plaintiff seniority rights as of the date June 27, 1935, and affirmed as to that portion declined to allow plaintiff damages. The cause will be remanded to the District Court with instructions to dismiss plaintiff's action.

*Reversed in part and affirmed*

*in part with instructions.*

KIMBALL, C. J., AND BLUME, J., concur.