**MILE BRANCH COAL COMPANY, Appellant,**

v.

**UNITED MINE WORKERS OF AMERICA, Appellee.**

No. 14585.

United States Court of Appeals District of Columbia Circuit.

Argued Feb. 25, 1959.

Decided May 14, 1959.

---

2. Under 27 Stat. 436 (1893), as amended, 35 U.S.C. § 63 (1946), as amended, 66 Stat. 803, 35 U.S.C. § 145 (1952).

Mr. Samuel L. Goldstein, Pittsburgh, Pa., of the bar of the Supreme Court of Pennsylvania, pro hac vice, by special leave of court, with whom Mr. Thurman Hill, Washington, D. C., was on the brief, for appellant.

Mr. John J. Wilson, Washington, D. C., with whom Messrs. Harrison Combs, Willard P. Owens and William E. Rollow, Washington, D. C., were on the brief, for appellee.

Before WILBUR K. MILLER, BAZELON and BURGER, Circuit Judges.

BAZELON, Circuit Judge.

Appellant, Mile Branch Coal Company, is a coal mine operator whose employees are members of a local union affiliated with the United Mine Workers of America, International Union, appellee. Mile Branch brought this suit to recover damages from the International for injuries resulting from a strike by the local. The complaint charged that International and its District No. 6 had entered into a labor-management contract with Mile Branch and other mine operators;[1] that International had expressly guaranteed to preserve the integrity of the contract, which included provisions specifying procedures for settlement of disputes arising thereunder;[2] that such a dispute arose between Mile Branch and its employees; and that officers of District No. 6, *acting as agents of the International*, not only had failed to seek enforcement of the settlement provisions, but had encouraged a walkout at the mine in express violation of those provisions.[3] There was no allegation that International had been notified of the dispute. International's answer included, *inter alia*, a denial that officers of District No. 6 were its agents.

When the case came on for trial, the trial judge ruled that International's liability for the alleged action of the District was a threshold issue separable from the remainder of the case. He therefore required Mile Branch to limit

---

1. The contract is the National Bituminous Coal Wage Agreement of 1950 as Amended September 29, 1952, entered into between the United Mine Workers of America and various coal operators and operators' associations.

2. National Bituminous Coal Wage Agreement of 1950 as Amended September 29, 1952, Miscellaneous, Subsection 3.

3. The President of District No. 6, and field representatives of the District, allegedly encouraged members of the local union, comprising the workers at Mile Branch's mine, to strike over a local dispute. These officials also allegedly refused to arbitrate the dispute, or transmit to the International, Mile Branch's request for arbitration.

its proof at the outset to that issue, on the theory that it would not be necessary to reach other issues if the evidence failed to establish, prima facie, the District's agency to act for the International.

To sustain this burden, Mile Branch introduced the Constitutions of the International Union and of District No. 6; the governing agreement between the United Mine Workers and Mile Branch; and testimony by Mile Branch's mine foreman (1) detailing the circumstances underlying the strike which is the subject of this suit, and (2) describing the practice followed at Mile Branch in attempting to resolve any labor disputes which arose at the mine—through direct and immediate recourse to District No. 6 officials. At the conclusion of this evidence, International moved for a directed verdict. The trial judge, relying heavily on United Mine Workers of America v. Coronado Coal Co., 1922, 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975, ruled that Mile Branch had failed to establish the existence of an agency relationship, and thereupon granted the motion. This appeal followed.

We think the evidence established a prima facie case that the officers of District No. 6 were agents of the International with authority to enforce the settlement provisions of the contract.

The evidence showed that the President and Secretary-Treasurer of District No. 6 are appointed to their posts by the President of the International, and that their salaries are paid by the International. The only appointments which the International's constitution authorizes its President to make fall into two categories: (1) specified International posts,[4] and (2) "such organizers, field and office workers as may * * * be necessary to conduct the affairs of the International Union."[5] In the absence of countervailing evidence, it would appear that District officers necessarily fall within the second category as agents of the International to "conduct [its] affairs * * *."

There was also evidence which tended to show that an agency relationship existed at least for the purpose of authorizing the District to act as agents of the International in settling local disputes in accordance with the provisions of the contract. International's constitution authorized a District to discipline any union member within its jurisdiction who caused a mine to be shut down in violation of a union-management contract.[6] And oral testimony showed that District officials had acted, in certain instances, as the responsible parties in requiring settlement of disputes in accordance with the contract procedure. Again, absent contrary explanation, it would appear that a scheme of organization existed under which the District was empowered to discharge its and the International's obligation to preserve the integrity of the contract provision.

We think that the trial court's reliance on United Mine Workers of America v. Coronado Coal Co., supra, is misplaced. Coronado was a private suit under the anti-trust laws for damages resulting from an alleged illegal conspiracy among the International, a District, various local unions and numerous individuals. The constitutions of the International and the District focused responsibility for local strikes on the District unless the International authorized or ratified the activities. Because the mine operators had failed to introduce any convincing evidence of such authorization or ratification, the Court held that their proof was

---

4. Constitution of the International Union, United Mine Workers of America, Article IX, §§ 2, 4, 9, 10.

5. Id., § 5.

6. Constitution of the International Union, United Mine Workers of America, Article XXI, § 10:

"Any member or members shutting down a mine in violation of Joint Agreement shall, upon conviction by the District organization, suffer such penalty as may be imposed upon them by the respective District organizations."

insufficient to establish an agency relationship between the International and the District. The alleged illegal activity in Coronado was an outgrowth of organizational activities, and there was not a contract, like the one in the present case, governing the relationship between the various union organizations and the mine operators, and imposing obligations upon and between the union bodies. And the Court specifically recognized that a showing of authorization might be made where, as in the present case, there was a "question of contract, or of holding out an appearance of authority * * *." [7]

Reversed and remanded for further proceedings in accordance with this opinion.

7. 259 U.S. at page 395, 42 S.Ct. at page 578.