**UNITED MINE WORKERS OF AMERICA, DISTRICT 22, Plaintiff,**

v.

**Leo RONCCO, Jr., and Pete Cavalli, partners doing business as Roncco Coal Company, et al., Defendants.**

**Civ. No. 4558.**

United States District Court
D. Wyoming.
Aug. 26, 1964.

Robert S. Lowe, Rawlins, Wyo., for plaintiff.

Richard S. Kitchen, Sr., Denver, Colo., and Gerald A. Stack, Thermopolis, Wyo., for defendants.

KERR, District Judge.

This action was commenced on November 24, 1961, under Section 301 of the Labor Management Relations Act (29 U.S.C. § 185). Plaintiff originally alleged various violations of the National Bituminous Coal Wage Agreement of 1950 as amended, as a result of which it allegedly suffered damages in the sum of $30,000. Plaintiff asked, also, for a declaration of the rights, duties and liabilities of the parties under said contract. This court sustained the defendants' motions to dismiss the complaint on the grounds that the trustees of the Welfare and Retirement Fund are the proper parties to commence suits to enforce payment to the fund; and that the court did not have jurisdiction over those alleged breaches of contract which related to rights which are uniquely personal to the individual employees. This court acknowledged jurisdiction over the alleged

failure of defendants to check off dues as being a matter of direct and peculiar concern to the plaintiff as an organization, but dismissed the complaint because the dispute alleged was arbitrable under the agreement and plaintiff had not pursued its contractual remedy before resorting to the court.

On appeal, the Court of Appeals agreed with the trial court concerning the matters which were not of peculiar concern to the plaintiff union as an organization to give the court jurisdiction. United Mine Workers of America, District 22 v. Leo Roncco, Jr., and Pete Cavalli, partners doing business as Roncco Coal Company, 10 Cir., 314 F.2d 186 (1963). It further agreed that the alleged failure to check off dues is a matter of direct and peculiar concern of the plaintiff as an organization and within the jurisdiction of the court. The Court of Appeals, however, was of the opinion that the plaintiff could not be required to resort to its contractual remedy of arbitration until the existence of a binding agreement to arbitrate was settled. It therefore remanded the case for further proceedings to determine whether any contract actually existed at all. This question, stated the Court of Appeals, includes the very real question of fact as to whether a notice of termination was sent by defendants to the plaintiff as required by the contract.

After the Mandate of the Court of Appeals was filed, the trial court vacated its order sustaining the motion to dismiss and granted plaintiff leave to file a second amended complaint. In its second amended complaint plaintiff alleged that on or about August 1, 1961, while the agreement was in full force and effect, defendants, in violation of the provisions of said Agreement ceased operating under and in conformity with the terms thereof; and from and after January 1, 1961, defendants violated and otherwise failed to observe certain of the terms and provisions set forth and contained in said Agreement which are of peculiar concern to the plaintiff as an organization. These uncertain and ambiguous allegations are clarified to some extent in the next paragraph of the second amended complaint wherein plaintiff alleged that "As a consequence thereof, defendant operator refuses to check off dues and initiation fees as stipulated in the agreement and has failed and refused to conform to the decision of and otherwise comply with the settlement procedures of disputes set forth in said agreement and defendant operator has generally damaged plaintiff by virtue of said breach of the parties' agreement." To what decision plaintiff refers in said allegation is not revealed, and no further reference is made to it in the course of these proceedings. Plaintiff also alleged that it suffered damages due to defendants' violation of the contract and that it is entitled to exemplary damages. In substance, plaintiff claims that the Agreement remained in full force and effect since its effective date to the time of this suit, even though plaintiff avers, also, that the termination of the Agreement's provisions and the unilateral cancellation of the Agreement by defendants constitute a violation thereof. A few days after this action was instituted and service had on the individual defendants, the Roncco Coal Company was incorporated. Upon leave of Court said incorporated company was added as a party defendant.

Defendants' answer to the second amended complaint put in issue the jurisdiction of this Court, the existence of the agreement, and its violation or performance by the parties. Defendants counterclaimed for damages in the amount of $100,000 allegedly suffered by reason of plaintiff's unlawful strike in October 1960.

It is the position of defendants that District 22 of the United Mine Workers of America is not the proper party to sue for the alleged violation of the contract as it is not a party to the contract, and is not the bargaining agent of defendants' employees. Section 301 of the Labor Management Relations Act can be invoked only by or against a party to the collective bargaining agreement on

which the action is founded. Square D Co. v. United Electrical, Radio and Machine Workers of America, et al., D.C. Mich., 123 F.Supp. 776 (1954). Plaintiff alleged that it is and was a labor organization within the meaning of the Act and that it and its duly authorized officers and agents were and are now engaged in representing and acting for employee members within Thermopolis, Wyoming. In the National Bituminous Coal Wage Agreement of 1950 as amended, upon which this suit is predicated, it is agreed that the United Mine Workers of America is recognized as the exclusive bargaining agency representing the employees of the Operators. Under the Constitution of the International Union of the United Mine Workers of America, the districts are not independent entities. They are chartered by and are under the jurisdiction of and are subject to the laws of the International Union and rulings of the International Executive Board. The International officers designate the numbers and territory of the districts. The districts may adopt such laws for their government as do not conflict with the laws or rulings of the International Union or Joint Agreements. The signatories to the National Bituminous Coal Wage Agreement of 1950 and its amendments were representatives of the International Union and of District No. 22, though the Agreement itself describes the party of the second part as the International Union, United Mine Workers of America on behalf of each member thereof. Neither the Agreement, nor the constitutions of the International Union or of the District 22 appear to empower the District to discharge the obligations of the International Union to preserve the integrity of the contract provisions. cf. Mile Branch Coal Company v. United Mine Workers of America, 105 U.S.App.D.C. 321, 266 F.2d 919 (1959).

In view of my conclusion herein that this Court does not have jurisdiction to settle the contractual disputes of the parties because they failed to comply with the arbitration or grievance provisions of the Agreement, it is not necessary for me to decide whether a district of the International Union was intended by Congress to be included in Section 301 of the Labor Management Relations Act.

Defendants have contended that Roncco Coal Company is not engaged in interstate commerce. In June 1961 the Attorney for the Regional Office of the National Labor Relations Board stated that Roncco Coal Company was not engaged in interstate commerce. In October 1961 the Regional Director of the National Labor Relations Board wrote to counsel for the plaintiff that Roncco Coal Company did not meet the Board's jurisdictional standards. Notwithstanding these credible assertions, I am bound by the preponderance of the evidence adduced in the trial of this case. The record shows that of the coal shipments from the Roncco Coal Company approximately twenty per cent was shipped out of the State of Wyoming. The railroad facilities of the Burlington railroad were used for shipping coal both in and out of the State of Wyoming. The explosives which constitute an important item in the mining operations of defendants were manufactured in the State of Washington; and practically all of the defendants' equipment and materials used in the operation of the mine were from out of state. See Shirley-Herman Co., Inc. v. International Hod Carriers, etc., Local Union No. 210, 2 Cir., 182 F.2d 806, 17 A.L.R.2d 609 (1950). The preponderance of the evidence supports the finding that the defendants were engaged in an industry affecting commerce. The de minimis doctrine enunciated in the case of Groneman, et al. v. International Brotherhood of Electrical Workers, Local Union No. 354, 10 Cir., 177 F.2d 995 (1949), is not applicable to the circumstances of the case before me.

Pursuant to the mandate of the Court of Appeals, a trial was held to determine whether the National Bituminous Coal Wage Agreement of 1950 as amended was in existence when this suit was com-

menced so as to require recourse to the arbitration machinery provided therein, or whether it was terminated by a notice of termination pursuant to the Contract. Defendants contend that the Agreement was terminated when the plaintiff breached the contract in July 1960 when defendants' rights to the benefits of the Welfare and Retirement Fund were cancelled, or when plaintiff went on strike against defendants in October 1960. Defendants claim also that in October 1960 the Agreement was mutually cancelled by plaintiff and defendants when it was allegedly agreed that defendants would check off the union dues but would not make the royalty payments. They take the position, also, that they terminated the Agreement as of August 1, 1961, when they gave written notice of termination by letter dated September 20, 1961. Finally, the defendants contend that the parties cannot resolve their differences in court because plaintiff failed to avail itself of the settlement remedies available to it under the Agreement. As stated earlier herein, plaintiff urges this court to find that the contract has always been in full force and effect.

■ The cancellation of defendants' eligibility to the benefits under the Welfare and Retirement Fund in July of 1960 did not amount to a termination of the National Bituminous Coal Wage Agreement of 1950 as amended. Under the terms of said Agreement, the Trustees had "full authority * * * with respect to questions of coverage and eligibility * * *." The authority of the Trustees to revise and adjust the eligibility requirements and coverage of the Welfare Fund is a valid and necessary function within their managerial and discretionary powers. Kosty v. Lewis, et al., 15 U.S.App.D.C. 343, 319 F.2d 744 (1963); Szuch v. Lewis, et al., D.C., 193 F.Supp. 831 (1960).

■ It is true, as defendants contend, that the strike in October 1960 violated the Agreement. At that time, however, the parties did not conduct themselves as if the strike, ipso facto, terminated the Agreement. Instead, the parties pursued the contractual settlement of disputes procedures, their differences were settled, and they operated under the terms of the contract throughout the ensuing mining season, that is, from October 1960 through April 1961. Defendants had coal on the ground and did not recall the employees immediately after the strike settlement. They did not prove to the satisfaction of this Court that they suffered any damages due to the strike which lasted about a week.

■ Defendants' third claim is likewise without merit when they assert the proposition that the Agreement was mutually cancelled in October 1960 by plaintiff's agent allegedly agreeing that defendants could forget the royalty payments so long as they paid up their union membership and checked off the union dues. The contractual provision with respect to the failure to make payments to the Welfare Fund reads as follows:

"UNITED MINE WORKERS OF AMERICA WELFARE AND RETIREMENT FUND OF 1950. * * Failure of any Operator signatory hereto to make full and prompt payments to the 'United Mine Workers of America Welfare and Retirement Fund of 1950' in the manner and on the dates herein provided *shall, at the option of the United Mine Workers of America, be deemed a violation of this Agreement.* * *." (Emphasis added.)

The record shows without contradiction that the United Mine Workers of America did not exercise the option available to it under the contract. The evidence discloses that Mr. Biggs, the Secretary-Treasurer of District 22, overzealous to settle the dispute about defendants' union membership and their check-off obligations, said something to the effect that if Roncco Coal Company would comply with the contract and catch up with the dues of the two partners, they could just forget about paying the forty cents royalty. Defendants knew or should have known that the secretary-treasurer of District 22 had no authority to waive the requirements for payment

into the fund, nor to determine questions of coverage and eligibility. They knew or should have known that what Mr. Biggs said was in substance, "forget about your dissatisfaction with the Trustee's determination of your ineligibility, and let's settle this matter of your union membership and check-off of dues." Under these circumstances there was no mutual rescission or cancellation of the contract by the non-payment of the royalty into the Welfare Fund.

■ Defendants argue that they terminated the Agreement on August 1, 1961, and that they complied with the termination provisions of the Agreement which provide as follows:

"TERMINATION OF AGREEMENT. This Amended Agreement, dated December 3rd, 1958, shall be effective as of December 1, 1958, and is not subject to termination by any party signatory hereto prior to November 30, 1959, PROVIDED, HOWEVER, That either the parties of the first part or the party of the second part may terminate this Agreement on or after November 30, 1959, by giving at least sixty (60) days' written notice to the other party of such desired termination date."

On September 20, 1961, Leo Roncco wrote to the Joint Industry Contract Committee stating that on August 1, 1961, Roncco Coal Company terminated its Agreement with the United Mine Workers of America, and that it was operating as a non-union mine. This Court is not satisfied that such letter constituted or was even intended to constitute the formal written notice of intention to terminate the contract as required by the Agreement. It was not addressed to the United Mine Workers of America, the signatory to the Agreement identified as party of the second part. Rather, it was addressed to a Committee whose jurisdiction and authority was limited to the Protective Wage Clause in the 1958 amended Agreement. The following contract clause shows unequivocally that the Joint Industry Contract Committee had nothing to do with the general provisions of the Agreement:

"PROTECTIVE WAGE CLAUSE. * * * E. Any party signatory to this contract shall have the right at any time to file a complaint with the Joint Industry Contract Committee alleging a violation of any provision of this Protective Wage Clause.

*"* * * The authority of the Committee is restricted to the subject matter covered in this Protective Wage Clause and shall not extend to disputes concerning the administration of the Contract which are of the type that have heretofore been processed under the grievance procedures provided for in the Section of the Contract entitled 'Settlement of Local and District Disputes';* * * *."* (Emphasis added.)

Defendants' purported notice of intention to terminate the Agreement addressed to the Joint Industry Contract Committee did not comply with the contract requirements and therefore defendants did not successfully terminate the Agreement on August 1, 1961, by the transmittal of said letter.

Furthermore, the letter of September 20, 1961, attempted to show an accomplished, retroactive termination rather than to give advance notice of an intended termination date. Mr. Roncco admitted to a dual purpose for sending the letter, viz: to advise the Union that the contract had been terminated, and also to put an end to the "duns" he had been receiving about his failure to make payments to the Welfare Fund.

The foregoing analysis of the facts dictates the conclusion that at the time of the commencement of this suit, the National Bituminous Coal Wage Agreement of 1950 as amended was in full force and effect and binding on the parties.

This leaves the final issue to be determined, namely, were the arbitration or grievance procedures of the Agreement followed by the parties before plaintiff resorted to the court? There is no dispute that they were not followed. Each

party avers in its pleadings that the other party failed to avail itself of the contractual remedy of arbitration. There is no evidence in the record that either party commenced or attempted to commence the settlement proceedings as required by the contract, as follows:

"MISCELLANEOUS. * * * 3. The United Mine Workers of America and the Operators agree and affirm that they will maintain the integrity of this contract and that all disputes and claims which are not settled by agreement shall be settled by the machinery provided in the 'Settlement of Local and District Disputes' section of this Agreement unless national in character in which event the parties shall settle such disputes by free collective bargaining as heretofore practiced in the industry, *it being the purpose of this provision to provide for the settlement of all such disputes and claims through the machinery in this contract provided and by collective bargaining without recourse to the courts.*" (As amended in 1952.) (Emphasis added.)

The "Settlement of Local and District Disputes" section of the Agreement above referred to, reads as follows:

"SETTLEMENT OF LOCAL AND DISTRICT DISPUTES. Should differences arise between the Mine Workers and the Operators as to the meaning and application of the provisions of this Agreement, or should differences arise about matters not specifically mentioned in this Agreement, or should any local trouble of any kind arise at the mine, *an earnest effort shall be made to settle such differences immediately*:

"1. Between the aggrieved party and the mine management.

"2. Through the management of the mine and the Mine Committee.

"3. Through District representatives of the United Mine Workers of America and a commissioner representative (where employed) of the coal company.

"4. By a board consisting of four members, two of whom shall be designated by the Mine Workers and two by the Operators.

"5. Should the board fail to agree the matter shall, within thirty (30) days after decision by the board, be referred to an umpire to be mutually agreed upon by the Operator or Operators affected and by the duly designated representatives of the United Mine Workers of America, and the umpire so agreed upon shall expeditiously and without delay decide said case. The decision of the umpire shall be final. Expenses and salary incident to the services of an umpire shall be paid equally by the Operator or Operators affected and by the Mine Workers.

"A decision reached at any stage of the proceedings above outlined shall be binding on both parties hereto and shall not be subject to reopening by any other party or branch of either association except by mutual agreement." (Emphasis added.)

There is nothing in the testimony or evidence in this case which shows that either party to the contract complied with the above mandatory, unconditional provisions of the Agreement. They were clearly ignored by both parties. Plaintiff failed to comply with paragraph 3 of the "Miscellaneous" section of the Agreement when it sought recourse to the courts instead of following the contractual settlement procedure. The allegations of breaches of the Agreement do not release the plaintiff from its duty to arbitrate the differences of the parties. Local Union No. 721, United Packinghouse, Food and Allied Workers, AFL–CIO v. Needham Packing Co., d/b/a Sioux City Dressed Beef, 376 U.S. 247, 84 S.Ct. 773, 11 L.Ed.2d 680 (1964). Neither party, by words or acts, waived its duty to arbitrate their differences.

The above-quoted sections of the Agreement contain, in broad language, the parties' agreement to arbitrate or settle all differences arising out of the contract. Those provisions do not excuse the parties from complying with the grievance procedures before resorting to the courts because of any alleged breach of the Agreement. The plaintiff has not attempted to terminate the entire contract or to extinguish permanently its obligations under the arbitration provisions. Instead, it has sued for damages, and the contract continues in effect as did the promises of the parties to arbitrate. Neither the strike in 1960, nor the failure to check off dues, nor the cancellation of defendants' eligibility to the Welfare Fund are such breaches of the arbitration clause that excuse the parties from arbitrating. "Arbitration provisions, which themselves have not been repudiated, are meant to survive breaches of contract, in many contexts, even total breach; * * *." Drake Bakeries Incorporated v. Local 50, American Bakery and Confectionery Workers International, AFL–CIO, et al., 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962). Regardless of the reprehensible conduct of the parties, the settlement or arbitration clause of the Agreement has survived and must be respected by the parties and by this court.

By the terms of Paragraph 3 of the "Miscellaneous" clause of the Agreement quoted hereinabove, both the parties agreed, in effect, to oust this court of jurisdiction to settle disputes until an earnest effort was made to settle the disputes immediately in the manner prescribed in the Agreement.

Absent a total renunciation or abandonment of the entire Agreement, the remedy pursued in this court by the plaintiff was premature and not available to it. As of the time of the commencement of this suit, the parties were bound by the Agreement and therefore were obligated to seek a remedy to their differences in the settlement provisions of the Agreement. I reiterate my conclusion in the original hearing in this suit, that this Court does not have jurisdiction to entertain this suit unless or until the contractual rights have been invoked. Transcontinental and Western Air, Inc. v. Koppal, 345 U.S. 653, 73 S.Ct. 906, 97 L.Ed. 1325 (1953); Alice M. Anson, et al. v. Hiram Walker & Sons, Inc., 7 Cir., 248 F.2d 380 (1957); Samuelson v. Brotherhood of Railroad Trainmen, et al., 60 Wyo. 316, 151 P.2d 347 (1944).

From what I have said I hold that The National Bituminous Coal Wage Agreement of 1950 at all times material has been in full force and effect and at the time of the commencement of this action it was binding on the parties thereto; that the defendants did not terminate the Agreement in the manner provided therein; that the Agreement was not mutually cancelled by the parties; that the Agreement requires recourse to the settlement procedure provided therein before the parties may resort to the court; that the parties did not repudiate the "Settlement of Local and District Disputes" section of the Agreement and did not comply with its procedure before instituting this action; that a breach of contract does not excuse the parties from complying with the grievance or arbitration procedure; that judicial relief is not available to plaintiff due to its failure to show that it has exhausted its internal remedies in the settlement procedure prescribed in the contract.

I further find that this action having been prematurely brought, the Court is powerless to award damages to the plaintiff in any sum whatsoever; likewise, the Court is impelled to deny any relief as set forth in defendants' counterclaim.

This opinion sufficiently states the findings of fact and conclusions of law of the Court. Further findings of fact and conclusions of law are not necessary and declaratory judgment will be entered accordingly.